UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.

CHADI MEZAYEK,

        Plaintiff,

v.

BEST PAYROLL SERVICES, LLC, d/b/a Green Dragon

        Defendant.

## COMPLAINT AND JURY DEMAND

Plaintiff, Chadi Mezayek, by and through his attorneys, HKM Employment Attorneys, LLP, for his Complaint & Jury Demand against Best Payroll Services, LLC, d/b/a Green Dragon ("Defendant" or the "Company") states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendant's failure to accommodate, discrimination toward and wrongful termination of Plaintiff because of his actual and/or perceived disability (neurological disorder, currently diagnosed as a type of Epilepsy), in violation of the Americans with Disabilities Act, as amended ("ADA").

2. More specifically, on or about January 8, 2019, Plaintiff lost consciousness at home and hit his head, causing a subarachnoid hemorrhage. Defendant refused to allow Plaintiff to return to work without a doctor's note confirming that he was medically able to do so. Accordingly, Plaintiff requested modest periods of leave from work until he could receive

1

clearance to return to work. On February 4, 2019, Plaintiff's Primary Care Physician released Plaintiff to return to work with temporary, one-month restrictions: no driving; and working up to half the day in the office and half the day at home. These restrictions would not have caused Defendant an undue burden, given that Plaintiff worked remotely half the time prior to his injury and Plaintiff was able to secure transportation when needed. Still, Defendant refused to accommodate Plaintiff's restrictions or allow him to return to work.

3.  Instead, on February 5, 2019, Defendant told Plaintiff that, due to his restrictions, he was being demoted with a significant reduction in pay. Plaintiff explained that he was expected to return to work without restrictions in less than a week, at his next neurology appointment on February 11, 2019. When Plaintiff asked if he could return to his salary position once he was released, Defendant told Plaintiff there would be no guarantee and that it would only "revisit" his return to his rightful position after one month.

4.  On February 7, 2019, Plaintiff made a good faith report of discrimination via email based on the Company's decision to demote him based on his actual and/or perceived disability, and/or in retaliation for requesting accommodations related to same. That same day, approximately five hours after Plaintiff's protected report, Defendant's Director of Human Resources, responded via email terminating Plaintiff and claiming that the Company "kindly accept[s] your resignation."

5.  As expected, Plaintiff was cleared to return to work without restrictions on February 11, 2019.

## PARTIES

6.  At all times relevant to this Complaint, Plaintiff is and was a resident of Colorado.

2

7. Defendant Best Payroll Services, LLC, d/b/a Green Dragon is a Colorado limited liability company with a principal place of business located at 2467 Sheridan Boulevard, Suite A, Edgewater, Colorado 80214.

## JURISDICTION AND VENUE

8. Plaintiff incorporates by reference the above paragraphs as though set forth separately and fully herein.

9. This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331.

10. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

11. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

12. Plaintiff filed his Charge of Discrimination Numbers 32A-2019-00555 and FE2019114303 with the Equal Employment Opportunity Commission ("EEOC") and the Colorado Civil Rights Division ("CCRD"), respectively, for disability discrimination and retaliation on or about May 10, 2019.  Plaintiff was issued a Notice of Right to Sue from the EEOC on January 23, 2020, and Plaintiff has filed the present action within ninety (90) days of receipt of same.

13. Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

14. Plaintiff incorporates by reference the above paragraphs as though set forth fully

and separately herein.

15. Defendant owns and operates multiple recreational and medical marijuana dispensaries in Colorado.

16. Plaintiff is an individual with a disability, in that Plaintiff suffers from a neurological disorder that has been diagnosed as a type of Epilepsy which has caused Plaintiff to experience episodic seizures. Without ameliorative devices, Plaintiff's neurological disorder substantially limits one or more major life activities, including the operation of Plaintiff's neurological system.

17. Plaintiff began working for Defendant in or around July 2018 as its Operations Manager.

18. At all times during his employment with Defendant, Plaintiff performed his job duties satisfactorily or better.

19. On or about January 8, 2019, Plaintiff was at home when he suddenly lost consciousness and hit his head, causing a subarachnoid hemorrhage.

20. On his way to the hospital following his loss of consciousness and resulting head injury, Plaintiff's wife called Plaintiff's supervisor, Kristopher Killingback, to notify Defendant of his injury. Mr. Killingback, Defendant's Director of Operations, and another manager of Defendant's, visited Plaintiff in the hospital the next day as Plaintiff's doctors treated his injury and tried to diagnose the cause of Plaintiff's loss of consciousness. Plaintiff was released from the ICU and ultimately discharged from the hospital approximately four days later.

21. Plaintiff attempted to return the following week, on or about January 14, 2019. When Defendant's Director of Human Resources, Stacey Newell, saw Plaintiff at work, she told

Plaintiff that he could not be there until he provided a doctor's note saying he was able to return to work.

22. The next day, January 15, 2019, Plaintiff had a doctor's appointment with his Primary Care Physician ("PCP") and was told that he could not return to work until he was cleared to do so by a neurologist. Plaintiff emailed his doctor's note saying the same to Ms. Newell. In doing so, Plaintiff requested the reasonable accommodation of leave from work until he could be cleared to return to work by a neurologist – consistent with the company's request that Plaintiff provide a doctor's note saying he was able to return to work before returning.

23. Ms. Newell approved Plaintiff's requested accommodation and responded to Plaintiff via email saying that he would be on leave from work "until such time as the [doctor] sees fit."

24. A week later, on January 28, 2019, Plaintiff notified Ms. Newell that he had an appointment with a neurologist scheduled for the coming Thursday, January 31, 2019. Plaintiff also asked Ms. Newell about his options if he was not cleared to return to work immediately following his upcoming appointment.

25. In response, Ms. Newell told Plaintiff that he was not eligible for leave under the Family & Medical Leave Act ("FMLA"), and that they would talk more after Plaintiff's doctor's appointment. Ms. Newell made no mention of Defendant's obligation to provide Plaintiff with reasonable accommodations developed during the course of the interactive process, or Defendant's obligation to engage in the interactive process at all, under the Americans with Disabilities Act, as amended ("ADA").

26. At Plaintiff's first appointment with his neurologist on January 31, 2019, the doctor

decided not to clear Plaintiff to return to work until he had a chance to get testing results to diagnose the underlying medical condition that could have caused Plaintiff's loss of consciousness and head injury. Plaintiff's neurologist provided Plaintiff with a note saying that he would be reevaluated at an appointment in two weeks.

27. Plaintiff emailed his doctor's note to Ms. Newell the same day, on January 31, 2019. In doing so, Plaintiff engaged in the protected activity of requesting two weeks of leave from work related to his disability.

28. The next day, Ms. Newell told Plaintiff that she would "talk with ownership to decide how we will move forward. I will cycle back with you as soon as I can."

29. Meanwhile, Plaintiff's supervisor, Mr. Killingback, told Plaintiff to try to obtain clearance to do light duty work and that he would work with Plaintiff to accommodate any restrictions. Plaintiff told Mr. Killingback that he would ask his PCP during his next appointment, on February 4, 2019, if he was able to work with restrictions.

30. On February 4, 2019, Plaintiff's PCP agreed that Plaintiff could work with certain temporary, one-month restrictions. For example, Plaintiff could work half the day remotely and half the day in the office. Prior to Plaintiff's loss of consciousness and head injury, Plaintiff had already been working remotely approximately half the time or more.

31. Plaintiff was also temporarily restricted from driving, which was not a problem because Plaintiff's wife was able to drive him to and from work. Mr. Killingback also offered to drive Plaintiff when needed, and Plaintiff notified Defendant that he could also use Uber or Lyft for transportation.

32. Plaintiff provided his doctor's note with these temporary restrictions to Ms. Newell

on February 4, 2019.

33. Ms. Newell told Plaintiff that Defendant needed "time to decide how we will proceed."

34. The next day, on February 5, 2019, Plaintiff was asked to come to the office for a meeting with Ms. Newell and Mr. Killingback. At the meeting, Plaintiff was told that, due to his temporary restrictions, he was being demoted from his position. Plaintiff was given an ultimatum of accepting the demotion, or finding somewhere else to work, i.e., termination.

35. Plaintiff explained that his next, second, appointment with his neurologist was scheduled as soon as February 11, 2019, less than a week later; and that he expected to be cleared to return to his current position as Operations Manager without any restrictions at that time.

36. Still, Defendant insisted that Plaintiff accept the demotion with a reduction in pay to only $12.00 hourly.

37. In his position as Operations Manager, Plaintiff earned a $45,000 salary.

38. In other words, Defendant's only effort to accommodate Plaintiff's restrictions involved a yearly reduction in pay of more than $20,000.

39. When Plaintiff asked if he could return to his position as Operations Manager once he obtained a release to return to work without restrictions, Defendant told Plaintiff that there would be no guarantee and that it would only "revisit" Plaintiff's return to his rightful position after one month.

40. On February 7, 2019, in response to Defendant's discriminatory ultimatum, Plaintiff made a protected report of discrimination in writing due to the Company's decision to demote him and significantly reduce his pay as a result of his actual and/or perceived disability,

and/or in retaliation for Plaintiff's request for accommodation related to same:

> I regret to say this, but I feel due to my medical condition and doctors['] orders, I feel somewhat discriminated against and being forced to be demoted or terminated. I really would just like to be cleared on [M]onday and continue my current career path as [O]perations [M]anager at Green Dragon. Please let me know your thought on this matter and I hope we can come to a solution.

41. Ms. Newell responded on the same day, approximately five hours later, nonsensically claiming that Defendant "kindly accept[s] your resignation."

42. Plaintiff immediately responded that he had not resigned, and that Defendant's decision to end his employment was a termination. Ms. Newell did not respond.

43. As expected, Plaintiff was released to return to work with no restrictions on February 11, 2019; only four days after Defendant terminated his employment.

44. Mr. Killingback has since informed Plaintiff that Defendant's owner, Andrew Levine, had told Mr. Killingback that he believed Plaintiff was "a lawsuit waiting to happen" because of his actual and/or perceived disability. Without engaging in the interactive process in good faith, Mr. Levine apparently believed that Plaintiff would lose consciousness while working and injure himself.

45. During his unemployment benefits appeal hearing, Ms. Newell also testified that Mr. Killingback had determined that Plaintiff could not work remotely half the time (pursuant to his temporary, one-month restrictions) and fulfill his job responsibilities as an Operations Manager.

46. However, Mr. Killingback has confirmed to Plaintiff that he did not make that determination, and that the statements made under oath by Ms. Newell were inaccurate. Also, though Ms. Newell knew that working remotely was a normal part of Plaintiff's position as

Operations Manager, she claimed that Defendant could not allow Plaintiff to do so during the temporary period of time that he was restricted from being in the office more than half a day.

**FIRST CLAIM FOR RELIEF**
**(Disability Discrimination and Failure to Accommodate in Violation of Section 102(a) and (b)(5)(A) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and (b)(5)(A))**

47. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

48. Plaintiff is a disabled person within the meaning of the ADA.

49. Plaintiff's neurological disorder is a physical impairment which, without ameliorative devices, substantially limits one or more major life activities as compared to the general population. For example, Plaintiff's neurological disorder has been diagnosed as a form of Epilepsy which has caused episodic seizures. When active, Plaintiff's Epilepsy affects the operation of his neurological system.

50. Though Plaintiff suffered from a disabling medical condition at the time of his termination, Plaintiff was qualified for his job and capable of performing the essential functions of his position with reasonable accommodations. Plaintiff further would have been able to perform the essential functions of his job without endangering himself or others.

51. At the time of Plaintiff's termination, Plaintiff was also regarded as being disabled by Defendant.

52. Defendant perceived Plaintiff as being substantially limited in his ability to work due to his neurological condition, when Plaintiff was not so limited.

53. On February 7, 2019, Defendant discriminated against Plaintiff because of his actual and/or perceived disability by demoting him, significantly reducing his pay, and terminating

Plaintiff's employment, in violation of the ADA.

54. Defendant further discriminated against Plaintiff because of his disability by denying Plaintiff reasonable accommodations and failing to engage in an interactive process calculated to develop a reasonable accommodation for Plaintiff prior to demoting him, subjecting him to a significant reduction in pay, and terminating his employment. Such reasonable accommodation would have permitted Plaintiff to perform the essential functions of his position and would not have imposed any undue hardship on Defendant.

55. For instance, Plaintiff requested the accommodation of being temporarily allowed to work half the day in the office and half the day from home. Temporarily allowing Plaintiff to work half the day in the office and half the day from home would not have caused undue hardship on Defendant.

56. Defendant failed to engage in the interactive process in good faith and denied Plaintiff's request of being temporarily allowed to work half the day in the office and half the day at home by demoting Plaintiff, significantly reducing his pay, and terminating Plaintiff.

57. The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect his status as an employee because of his actual and/or perceived disability, and/or Defendant's refusal to accommodate Plaintiff or engage in the interactive process in good faith.

58. Defendant's above-described conduct was intentional.

59. Defendant's above-described conduct was done with malice or reckless indifference to Plaintiff's federally protected rights.

60. As a direct and proximate result of Defendant's above-described actions, Plaintiff

has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**SECOND CLAIM FOR RELIEF**
**(Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))**

61. Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

62. In the month leading up to his sudden termination, Plaintiff engaged in multiple instances of protected activity under the ADA. For example, on January 15, 2019, Plaintiff made a request for reasonable accommodation related to his actual and/or perceived disability. Specifically, Plaintiff requested the accommodation of being allowed to take two weeks of leave from work until he could be cleared to return to work by a neurologist. In making this request, Plaintiff was engaging in activity protected under the ADA.

63. On January 31, 2019, Plaintiff made a request for reasonable accommodation related to his actual and/or perceived disability. Specifically, Plaintiff requested the accommodation of being allowed to take two weeks of leave from work until he could be reevaluated to return to work by his neurologist. In making this request, Plaintiff was engaging in activity protected under the ADA.

64. On February 4, 2019, Plaintiff made a request for reasonable accommodation related to his actual and/or perceived disability. Specifically, Plaintiff requested the accommodation of being allowed to work half the day from the office and half the day at home. In making this request, Plaintiff was engaging in activity protected under the ADA.

65. On February 7, 2019, Plaintiff also made a reasonable report of discrimination

based on Defendant's decision to offer Plaintiff a discriminatory ultimatum: to accept a demotion with a significant reduction in pay or find employment elsewhere.  At the same time, Defendant refused to suggest or provide any accommodations or position modifications that would allow Plaintiff to return to work in his position as Operations Manager.  Defendant also refused to engage in the interactive process with Plaintiff prior to deciding to demote him, reduce his pay, and terminate his employment.  In making a report of discrimination, Plaintiff was engaging in protected activity under the ADA.

66. Defendant retaliated against Plaintiff after he engaged in the above-described protected activity by demoting him, significantly reducing his pay, and terminating his employment on February 7, 2019.  These are consequences that would tend to discourage similarly situated employees from requesting accommodations related to a protected medical condition, and that would similarly tend to chill reasonable reports of violations of the ADA. For example, mere hours after Plaintiff's protected report of discrimination, Defendant terminated Plaintiff's employment, claiming the Company "kindly accept[s] your resignation."

67. Defendant's above-described conduct was intentional.

68. Defendant's above-described conduct was done with malice or with reckless indifference to Plaintiff's federally protected rights.

69. As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience, and he is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

B. Punitive damages for all claims as allowed by law;

C. Attorneys' fees and costs of this action;

D. Pre-judgment and post-judgment interest at the highest lawful rate; and

E. Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 9th day of March 2020.

HKM EMPLOYMENT ATTORNEYS LLP

By: *s/ Shelby Woods*
Claire E. Hunter (39504)
Shelby Woods (48606)
HKM Employment Attorneys LLP
730 17th Street, Suite 750
Denver, Colorado 80202
chunter@hkm.com
swoods@hkm.com
*Attorneys for Plaintiff Chadi Mezayek*